UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONELLE DURHAM,<br><br>                              Plaintiff,<br><br>       v.<br><br>VASSAR COLLEGE,<br><br>                              Defendant. | **COMPLAINT**<br><br>Case No. 7:25-CV-5154<br><br>ECF Case |

COMES NOW PLAINTIFF Donelle Durham, by his undersigned attorney, for his Complaint against Defendant Vassar College, and alleges as follows:

### NATURE OF THE ACTION

1. This is an action for unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, on the grounds that Defendant, by its officers, employees, and/or agents, disciplined and terminated Plaintiff because he requested and received a religious accommodation to Defendant's COVID-19 vaccination policy. Plaintiff asserts a concurrent claim under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* By this action, Plaintiff seeks all available legal and equitable relief, including back pay, front pay, out of pocket costs, compensatory damages, punitive damages, civil fines and penalties, and attorney's fees, costs, and disbursements. Plaintiff demands trial by jury.

### PARTIES

2. Plaintiff **Donelle Durham (Durham)** is an adult person who resides in Auburn, Georgia.

3. For purposes of this action, Durham is a citizen of Georgia.

4. At all relevant times, Durham was an "employee" of Defendant within the meaning of Title VII and the New York State Human Rights Law.

1

5. Defendant **Vassar College (Vassar)** is a private liberal arts college located in Poughkeepsie, New York (Dutchess County).

6. For purposes of this action, Vassar College is a citizen of New York.

7. At all relevant times, Vassar College was Plaintiff's "employer" within the meaning of Title VII and the New York State Human Rights Law.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

9. This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity), because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. Alternatively, this Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367, because Plaintiff's federal and state law claims derive from a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution.

11. Defendant is subject to this Court's personal jurisdiction because Vassar College's campus is located in this judicial district.

12. This Court has venue over this action pursuant to 28 U.S.C. §§ 1391(b)(1) and/or (b)(2), because Defendant resides in this judicial district and/or a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

13. This Court also has venue over this action pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII), because this is the judicial district in which the unlawful employment practice is alleged to have been committed, in which the employment

records relevant to such practice are maintained and administered, and/or in which Plaintiff would have worked but for the alleged unlawful employment practice.

## ADMINISTRATIVE EXHAUSTION

14. Plaintiff properly exhausted his administrative remedies under Title VII prior to filing this action.

15. On August 16, 2022, Plaintiff filed a charge of discrimination against Defendant with the New York District Office of the U.S. Equal Employment Opportunity Commission (EEOC).

16. A true and correct copy of Plaintiff's EEOC Charge is attached as **Exhibit A**.

17. The charge was assigned number 520-2022-05280.

18. On March 3, 2025, the Miami District Office of the EEOC (to which Plaintiff's charge had been transferred) issued a Letter of Determination, finding, *inter alia*, "reasonable cause to believe Respondent violated Title VII . . . by subjecting Charging Party to disparate treatment, retaliation, and a hostile work environment culminating in his termination."

19. A true and correct copy of the Letter of Determination is attached as **Exhibit B**.

20. On March 26, 2025, the EEOC issued a Conciliation Failure and Notice of Rights.

21. A true and correct copy of the Conciliation Failure and Notice of Rights is attached as **Exhibit C**.

22. This action is being filed within 90 days of Plaintiff's receipt of the Notice of Rights.

23. There are no administrative exhaustion requirements for Plaintiff's concurrent claim under the New York State Human Rights Law.

## FACTUAL ALLEGATIONS

*Durham's Employment with Vassar College*

24. Durham was employed by Vassar College as the Associate Director of Diversity Outreach from on or about July 27, 2020, until his wrongful termination on or about November 23, 2021.

25. Durham relocated from Tucker, Georgia, in the middle of the COVID-19 pandemic, to take the position at Vassar, which he considered an excellent opportunity for his career in college admissions.

26. A true and correct copy of Durham's hiring letter dated July 13, 2020, is attached as **Exhibit D**.

27. Durham's starting salary was $79,000 per year. He had a choice of medical plans, with coverage starting August 1, 2020. He was entitled to participate in Vassar's "generous retirement plan," which included matching contributions starting August 1, 2021. He was allowed 22 paid vacation days per year. He received $1500 per year for professional development. And he would be reimbursed up to $3500 for moving expenses from Georgia to New York.

28. As Associate Director of Diversity Outreach, Durham was a member of Vassar's Office of Admission.

29. Durham reported to David Toomer, the Director of Admission, and Sonya Smith, the Dean of Admission and Student Financial Services.

30. In his position, Durham worked with other members of the Admission Office to select candidates for the entering class at the college and to represent the college at recruitment events. His primary responsibilities included spearheading

the office's diversity student recruitment efforts to enhance the representation of students of color, low-income, first-generation, and other historically underrepresented students on campus.

31. A true and correct copy of Durham's job description is attached as **Exhibit E**.

32. At all times, Durham was qualified for his position and performed his job duties in a satisfactory manner.

33. Indeed, until the events of this case, Durham was considered a top performer in the Admissions Office.

34. On or about September 21, 2021, Durham received his annual performance evaluation covering his first year of employment (rating period of July 1, 2020 to June 30, 2021). Durham received an overall rating of "Met/Exceeded Expectations." This rating meant: "Performance consistently met or exceeded Vassar's high standards and expectations. All critical annual goals were achieved. Incumbent widely recognized as a strong and valued contributor."

35. In recognition of his outstanding job performance, in July 2021 Durham received a 2% salary increase, which was the highest raise possible. This was comprised of a 1% increase paid to all employees "meeting normal expectations for performance" plus an additional 1% paid to "senior officers" "for meritorious performance." Accordingly, Durham's salary was increased to $80,580.

36. Durham's job performance did not change for the worse between July 2021 when he received a raise "for meritorious performance" and November 2021 when he was terminated. What changed was that Durham requested and received a religious exemption to the college's COVID-19 vaccination policy, for which Smith and Toomer retaliated against him.

*Durham's Religious Exemption*

37. Effective August 27, 2021, Vassar instituted a mandatory COVID-19 vaccination policy for all students, faculty, and employees who work on campus.

38. The vaccination policy required employees to be fully vaccinated by September 24, 2021, or be subject to disciplinary action up to and including termination.

39. The vaccination policy allowed for reasonable accommodations based on a medical condition or bona fide religious beliefs or practices.

40. With respect to religious accommodations, the policy provided that "[t]he College will provide reasonable accommodations to those individuals whose religious beliefs bar COVID-19 vaccination so long as the failure to be immunized (a) will not prevent the individual from fulfilling the essential functions of his/her/their position, (b) do[es] not cause the College undue hardship, and (c) do[es] not pose a direct threat to the health and safety of others."

41. Durham is an observant Christian whose religious beliefs prevent him from taking the COVID-19 vaccines.

42. On or about August 26, 2021, Durham requested a religious exemption from the COVID-19 vaccination policy.

43. On September 2, 2021, Durham's religious exemption was approved by Vassar's Human Resources department. Durham's exemption began on August 26, 2021, and did not expire.

44. On September 9, 2021, Durham informed his supervisors that he had been granted a religious exemption to the college's COVID-19 vaccination policy.

45. That morning, Durham went to Smith's office and told her that he had received an exemption from the vaccination policy, and Smith immediately reacted

6

in a negative manner. She challenged him, "Did you get it in writing?" Durham told her, "Yes, I did get it in writing." Smith complained, "I was supposed to be informed if anyone on my team got an exemption," and Durham offered to forward her a copy of his approval letter. Smith then stated, in sum and substance, "Donelle, I don't know what we're going to do about this. As a member of the leadership team in the admissions office and not being vaccinated, I just don't know what we're going to do about this. If we had to re-assign your territory to someone else. If we had to get someone to cover New York for you. I just don't know what we're going to do about this." Durham said "okay" and left Smith's office.

46. On September 9, 2021, at 11:49 a.m., after his brief conversation with Smith, Durham sent an email to Smith and Toomer forwarding the exemption letter he had received from HR.

47. A true and correct copy of Durham's September 9 email and exemption letter is attached as **Exhibit F**.

48. Upon learning about Durham's religious exemption, Smith and Toomer embarked on a campaign, with the assistance of other Vassar College officers, employees, and/or agents, to bring unfounded disciplinary charges against Durham for the purpose of terminating his employment.

*COVID-19 Health & Safety Protocols*

49. Although Durham was not required to take the COVID-19 vaccination, he was required to follow the college's health and safety protocols regarding COVID-19.

50. As updated on September 15, 2021, these protocols included wearing masks indoors (unless working alone), maintaining physical distance when possible, completing a daily health assessment, and for all events (indoor or outdoor)

7

providing proof of vaccination "or evidence of a negative PCR COVID-19 test taken within three days of the event or negative rapid antigen test the day of the event."

51. At all times, Durham followed the applicable health and safety protocols.

*The "Rooted" Event*

52. "Rooted: Community at Vassar" was an on-campus event for prospective students hosted by the Admission Office that included networking, panels, and student-led tours. The program was created, designed, and organized by Durham, who was responsible for overseeing the entire program.

53. Rooted was scheduled to take place on Saturday, September 18, 2021, starting at 1:00 p.m.

54. On September 16, 2021, Toomer sent an email to members of the Admission Office regarding arrangements for providing proof of vaccination or negative test results prior to the Rooted event. He noted certain times when he would be available on Friday and Saturday to check documentation. He reminded staff that "PCR test results must be from a test taken 72 hours or less from the start time of the event, and the rapid test results must be from the day of the event."

55. In accordance with the health and safety protocols, on the morning of the Rooted event, Durham took a rapid antigen self-test, which was negative.

56. Prior to the start of the program, Toomer was not present at the time and place noted in his email to check documentation, so Durham continued with his various preparation activities for the event.

57. At 12:58 p.m. just before Durham was about to walk on stage and welcome the guests to the program, Toomer approached Durham and asked to see

8

his test results, to which Durham responded, "You're asking for this right before I walk out on stage?" Toomer told Durham, "Okay, just show me later."

58. After the program ended that day, Durham took another rapid antigen self-test in Toomer's presence, which also was negative. Toomer told Durham, in sum and substance, "Okay, this is fine this time, but next time go get a test done at Rite Aid or have someone do the test for you. I am not trained in knowing how to read test results." When Durham responded by saying, "I thought this was what I was supposed to do," Toomer again told him, "It's fine this time, but next time go get the test done at Rite Aid or the Aula [on-campus testing location] once they start offering testing there."

59. In connection with the Rooted event, Durham complied with the college's health and safety protocols.

60. Durham tested negative for COVID-19 prior to the Rooted event.

61. Toomer approved Durham's participation in the Rooted event, without first seeing proof of his negative test result.

62. Durham provided evidence of a negative test result to Toomer on the day of the event.

63. Toomer approved Durham's use of a rapid antigen self-test.

64. Toomer never indicated to Durham that he was in violation of the college's health & safety protocols.

65. Toomer never indicated to Durham that he should not have participated in the Rooted event.

*Final Written Warning*

66. To Durham's shock and dismay, on September 22, 2021, he received an email from Toomer issuing him a "final written warning" for allegedly failing to provide a negative test result prior to the Rooted event.

67. This was the first Durham had heard about there being any problems with how he handled his COVID-19 testing for the Rooted event.

68. A true and correct copy of Toomer's September 22 email is attached as **Exhibit G**.

69. Toomer's email stated that it was being issued "in consultation with Human Resources."

70. Upon information and belief, before sending the email, Toomer consulted with and received approval from Smith (who was cc'd on the email).

71. Toomer's email was false and malicious and issued in retaliation for Durham's religious exemption.

72. Toomer's email deliberately misrepresented the facts relating to the Rooted event to build a case against Durham, including falsely stating that

- "You put others at risk and also violated the campus events protocol," when Toomer knew that Durham had tested negative for COVID-19 that day and Toomer approved Durham's participation in the event without first seeing proof of the negative test result;

- "on Friday morning, we discussed your need to provide the results of your rapid test on Saturday prior to the program," when no such conversation occurred;

- "you failed to report to Skinner at 12pm, so I wasn't able to check your documentation," when Durham was present in the building at that time but Toomer was not;

- "You said that you had the information, but that you had left it either in your car or in your office," when Durham made no such remark;

- "you never provided me with the required proof," when Durham provided Toomer with his negative test results after the program ended;

- "you should not have participated in the program without first providing the negative test result," when Toomer expressly allowed Durham to show him the test results after the event.

73. The email concluded by stating "[t]his is a final written warning. If you demonstrate additional inappropriate behavior, further corrective action may ensue up to and including termination."

74. The September 22 final warning letter was the opening salvo in Smith's and Toomer's campaign to terminate Durham's employment because he had received a religious exemption to the college's COVID-19 vaccination policy.

75. On September 23, 2021, Durham responded to Toomer by email, cc'ing Smith, expressing that "I'm very confused by your [September 22] email." Durham explained:

> I did indeed take a COVID-19 rapid antigen test prior to attending the event that showed a negative test result however I knew I had no way of proving to you that the test was taken that day given it was an at home test, which is why I decided to take the test again in your presence. I am also surprised to receive a final written warning as I feel like I haven't received a warning about this issue prior to this email. I could've provided the test result that I took "prior" to my arrival but I feel like this is the first time I'm hearing that it was an issue. . . . I know after I took the test in your presence on the date of the Rooted program, you mentioned that next time I should have the test taken by someone else as opposed to a rapid antigen test kit that I purchased from a local pharmacy store. I don't recall you mentioning anything about the timing of the test. . . . I'm very confused by this email but have no problems at all complying with the policy that has been set forth by the college. . . .

76. A true and correct copy of Durham's September 23 email is attached as **Exhibit H**.

11

77. As noted in Durham's September 23 email, the final written warning did not comport with the college's progressive disciplinary policy.

78. Under the college's progressive disciplinary policy, the first step is oral counseling, followed by oral warning, written warning, final written warning with or without disciplinary suspension, and finally discharge.

79. The Vassar College Administrator Handbook states (at 18) that "[t]he approach used for corrective action is intended to maintain a productive and safe work environment for all employees and to ensure employees that they will receive fair and equitable treatment." The Handbook makes clear (at 18) that progressive discipline "will be used for problems involving an employee's work performance" and that "[i]n most cases, disciplinary action should occur in progressive steps so that termination occurs only after efforts have been made to correct the performance issues." The Handbook emphasizes (at 19) that "[i]t is the intent of the College to consistently apply these guidelines with supervisors and employees in all cases . . . ."

80. The evidence shows that Defendant did not apply its disciplinary policy to Durham in a fair, equitable, or consistent manner.

81. Plaintiff is aware of at least one example where another member of the Admission Office, who did not have a religious exemption, allegedly violated the college's COVID-19 policies but received only an oral warning.

82. Upon information and belief, discovery will reveal additional examples where other members of the Admission Office, who did not have exemptions, allegedly violated the college's COVID-19 policies but did not receive final written warnings.

83. On September 28, 2021, Durham returned to campus from a business trip and spoke with Candice West, the Associate Director of Human Resources,

about the final written warning. He told to her what had happened during the Rooted event and explained that Toomer was making false accusations against him. Durham also complained that he was being discriminated against on the basis of religion. He asked for the final written warning to be removed from his file.

84. During their meeting, West told Durham that she would speak about his case with Sarah Baake, the Assistant Vice President of Human Resources, but expressed doubts that the final written warning would be removed from his file because it had been issued with the involvement of "senior members" of the college. West also explained that the leadership of the college was "passionate about everyone being vaccinated." West told Durham he could write up a response to the final written warning to be added to his file.

85. Durham submitted a letter responding to the final written warning on September 29, 2021. West acknowledged receipt of the letter and said it would be included in Durham's file but would not be shared with others outside of HR.

86. A true and correct copy of Durham's September 29 letter is attached as **Exhibit I**.

87. After Durham submitted his letter, he received no further communications from HR or his managers about this issue.

*Oral Warning*

88. On November 2, 2021, Toomer gave Durham an oral warning and followed up by email on November 3, 2021.

89. As described in the email, the oral warning was issued "primarily in response to your lack of attention to detail and process in reviewing a student's file, which led you to render a deny decision on a Vassar View applicant." The email falsely accused Durham of "approv[ing] the release of decisions without gaining the

13

greenlight or verification from the Dean or Director prior to the send." The email falsely accused Durham of "a pattern of disregard for office processes and expectations."

90. A true and correct copy of Toomer's November 3 email is attached as **Exhibit J**.

91. This oral warning was another fabricated performance problem used to build a case against Durham in retaliation for his religious exemption.

92. Durham responded to Toomer by email on November 4, 2021, comprehensively rebutting Toomer's accusations. In his rebuttal, Durham pointed out that "it was a committee decision to deny the applicant" in question, that "there was not a watch flag on the applicant," that Smith had "specified that the decision emails are ready to go," and that "I followed the instructions that were provided to me so I'm confused about how I disregarded any office processes or expectations."

93. A true and correct copy of Durham's November 4 email is attached as **Exhibit K**.

94. Despite being in his position and involved in making admissions decisions for more than one year (including specifically for the Vassar View program), this was the first time Durham had been accused of failing to "follow, promote, and model office processes as well as support and carry out expectations."

95. Using his judgment and discretion in making admissions decisions was part of Durham's job responsibilities. This is a largely subjective process that cannot be reduced to a specific formula. That Toomer may have disagreed with the decision in question does not mean Durham acted improperly.

96. Moreover, if, as Toomer accused Durham, an erroneous, unauthorized decision was made in denying this particular applicant (or any applicant), then

14

everyone involved in the decision should have been disciplined, not just Durham. Only Durham was disciplined because this was part of Smith's and Toomer's campaign against him in retaliation for his religious exemption.

*Counselor of the Day (COD) Issue*

97. On October 22, 2021, and November 19, 2021, the Admission Office hosted "counselor of the day" (COD) events. These events involve Admission Office staff greeting visitors, assisting with in-person information sessions, answering phone calls and emails from prospective students, and assisting with virtual programming for prospective students.

98. For the event on November 19, 2021, Durham was assigned to answer phone calls and emails, which he performed, but also to greet visitors, which he asked another staff member to cover for him (to avoid a COVID-19 testing issue). That day, Toomer accused Durham of reassigning his COD duties without authorization. This accusation was false.

99. All Admission Office staff had the ability to reassign their duties for COD events. This was a common occurrence in the office. Indeed, Toomer expressly advised Durham in an email on August 4, 2021, "Please keep in mind that it is the responsibility of the COD to find coverage when they have conflicts." Toomer reiterated these instructions in an all-staff email on November 17, 2021.

100. Once again, Toomer falsely accused Durham of wrongdoing for the purpose of building a case against him in retaliation for his religious exemption.

*Durham's Termination*

101. On November 23, 2021, Smith emailed Durham informing him that a follow-up meeting to discuss the COD issue was scheduled for 12:45 p.m. in HR. When

Durham arrived, Smith and Carlos Garcia, the Vice President for Technology & Human Resources were present.

102. Garcia started the meeting by stating that he understood there was an incident the past Friday that Toomer had spoken about with Durham, and Durham answered "yes." Garcia then stated, "I think it's time that we start talking about your departure from the college." After informing Durham he was being terminated, Garcia commented, "It sounds like you have a bright future ahead of you and so we wanted to offer you a separation agreement as you think about your next venture." After outlining the terms, Garcia told Durham he had 24 hours to decide whether or not to accept the offer and recommended that he consult with an attorney before making his decision.

103. Durham did not accept the offer, which would have required him to release his legal claims against the college for a measly two months salary.

104. Durham's termination by Vassar College has caused and will continue to cause Durham to suffer financial hardship and mental and emotional distress.

105. Upon information and belief, Durham's total compensable damages exceed $75,000, exclusive of interest and costs.

### COUNT ONE: VIOLATION OF TITLE VII

106. Plaintiff repeats and incorporates Paragraphs 1-105 above.

107. Durham was a covered employee under Title VII.

108. Vassar College was a covered employer under Title VII.

109. Durham engaged in legally protected activity when he requested and received a religious accommodation to Defendant's COVID-19 vaccination policy.

16

110. As alleged above, Defendant violated Plaintiff's rights under Title VII by retaliating against him, by disciplining and terminating him, for requesting and receiving a religious accommodation to Defendant's COVID-19 vaccination policy.

111. Defendant's unlawful retaliatory motive was a but-for cause of Plaintiff's discipline and termination.

112. Defendant was recklessly indifferent to Plaintiff's federally protected rights.

113. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered pecuniary and non-pecuniary damages, including lost income and benefits and mental and emotional distress, for which he is entitled to an award of back pay, front pay, out of pocket costs, compensatory damages, punitive damages, and attorney's fees, costs, and disbursements.

**COUNT TWO: VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**

114. Plaintiff repeats and incorporates Paragraphs 1-113 above.

115. Durham was a covered employee under the New York State Human Rights Law.

116. Vassar College was a covered employer under the New York State Human Rights Law.

117. Durham engaged in legally protected activity when he requested and received a religious accommodation to Defendant's COVID-19 vaccination policy.

118. As alleged above, Defendant violated Plaintiff's rights under the New York State Human Rights Law by retaliating against him, by disciplining and terminating him, for requesting and receiving a religious accommodation to Defendant's COVID-19 vaccination policy.

17

119. Defendant's unlawful retaliatory motive was a but-for cause of Plaintiff's discipline and termination.

120. Defendant was recklessly indifferent to Plaintiff's state law rights.

121. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered pecuniary and non-pecuniary damages, for which he is entitled to an award of back pay, front pay, out of pocket costs, compensatory damages, punitive damages, civil fines and penalties, and attorney's fees, costs, and disbursements.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury as to all issues triable by jury in the above-captioned civil action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment against Defendant on his claims under Title VII and the New York State Human Rights Law, and award him the following relief:

A. Back pay in an amount to be determined at trial;

B. Front pay in an amount to be determined at trial;

C. Out of pocket costs in an amount to be determined at trial;

D. Compensatory damages in an amount to be determined at trial;

E. Punitive damages in an amount to be determined at trial;

F. Civil fines and penalties in an amount to be determined at trial;

G. Pre-judgment and post-judgment interest;

H. Attorney's fees and costs (including expert witness fees);

I.  Appropriate injunctive relief; and

J.  Such other relief as justice may require.

Dated: June 19, 2025

Respectfully submitted,

By: /s/ *Steven M. Warshawsky*
_____
Steven M. Warshawsky, Esq.
The Warshawsky Law Firm
*Attorney for Plaintiff*
118 North Bedford Road, Suite 100
Mount Kisco, New York  10549
Tel:  (914) 864-3353
Email:  smw@warshawskylawfirm.com

Attachments:

Exhibit A – EEOC Charge of Discrimination 8/16/2022
Exhibit B – EEOC Letter of Determination 3/3/2025
Exhibit C – EEOC Conciliation Failure and Notice of Rights 3/26/2025
Exhibit D – Hiring Letter 7/13/2020
Exhibit E – Job Description
Exhibit F – Durham Email 9/9/2021 re religious exemption
Exhibit G – Toomer Email 9/22/2021 re final written warning
Exhibit H – Durham Email 9/23/2021 re final written warning
Exhibit I – Durham Letter 9/29/2021 re final written warning
Exhibit J – Toomer Email 11/3/2021 re oral warning
Exhibit K – Durham Email 11/4/2021 re oral warning